UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LISA S. SHAFFER,                        )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )     No. 4:09 CV 1614 CAS / DDN
                                        )
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
            Defendant.                  )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Lisa S. Shaffer for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401-34, and §§ 1381-1383f, respectively. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

**I. BACKGROUND**

Plaintiff, who was born in 1963, filed applications for Title II and Title XVI benefits on March 7, 2007. (Tr. 94-104.) She alleged an onset date of disability of May 1, 2003, alleging she became disabled due to pain, rheumatoid arthritis,[1] costochondritis,[2] depression, silicone immune

---

[1]Rheumatoid arthritis is a generalized disease, occurring more often in women, which primarily affects connective tissue and involves many joints, especially those of the hands and feet. Stedman's Medical Dictionary 160 (28th ed. 2006).

[2]Costochondritis is the inflammation of one or more costal (rib) cartilages, characterized by local tenderness and pain of the anterior chest wall. Stedman's at 344.

dysfunction, connective tissue disorder, gastroesophageal reflux disease (GERD), fibromyalgia,[3] and chronic fatigue syndrome.[4] (Tr. 94, 97, 139.)

Plaintiff's applications were denied initially, and a timely request for a hearing was filed. (Tr. 49-58, 60.) On February 29, 2009, following a hearing, an administrative law judge (ALJ) rendered a decision finding that plaintiff was not "disabled" as defined under the Act. (Tr. 5-15.) On July 25, 2009, the Appeals Council denied plaintiff's request for review. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

In August 2002, plaintiff underwent a resting EKG/resting treadmill test for symptoms of chest pain, the results of which were normal. (Tr. 172-75.) In August 2002, she also saw Bharat Gopal, M.D., with complaints of fatigue and left arm numbness. (Tr. 176.) Dr. Gopal noted that a chest x-ray, computed tomography (CT) scan of the head, abdominal ultrasound, and mammogram were normal. (Tr. 176.) There was tenderness in the left side of her chest. (Tr. 177.)

In September 2002, plaintiff saw Sandra S. Hoffman, M.D., for a rheumatology consultation. (Tr. 179-180.) Plaintiff complained of severe chest pain in the center of the chest, which worsened with activity and which had been present for six weeks. (Tr. 179.) Dr. Hoffman noted that plaintiff's hands, wrists, elbows, and shoulders were relatively unremarkable. (Tr. 179.) She had a good range of motion of both hips and both knees with mild crepitus or crackling. (Tr. 179.) Dr. Hoffman indicated that plaintiff's breast implants might be causing her chest pain and referred her to a surgical specialist. (Tr. 179.) Dr. Hoffman also believed plaintiff's chest pain could be related to

---

[3]Fibromyalgia is a condition involving lack of stage IV sleep and chronic diffuse widespread aching and stiffness of muscles and soft tissues; diagnosis requires 11 of 18 specific tender points. Stedman's at 541.

[4]Chronic fatigue syndrome is debilitating fatigue not substantially relieved by rest and concurrent four of eight symptoms persisting or occurring during six or more consecutive months. Stedman's at 1894.

depression, although plaintiff was very resistant to this suggestion. (Tr. 180.) Plaintiff was also resistant to trying an antidepressant to treat her fibromyalgia. (Tr. 180.)

On September 9, 2002, plaintiff underwent an ultrasound of her upper abdomen which was essentially normal. (Tr. 181.) On September 10, she underwent a double contrast upper gastrointestinal (GI) series, which was also essentially normal. (Tr. 182-183.) On September 25, 2002, plaintiff saw Dr. Hoffman with continued complaints of chest pain. Dr. Hoffman generally assessed her with depression and urged her to take medication, which plaintiff declined. (Tr. 180.)

On December 9, 2002, plaintiff underwent an ultrasound to evaluate for possible extracapsular[5] silicone in her breast implants. No characteristic extracapsular free silicone was identified. (Tr. 186-87.) She continued to suffer chest pain, and had both breast implants surgically removed on December 11, 2002. (Tr. 188-89.) At the time the implants were removed, there was evidence of silicone bleed within its shell, but no evidence of gross ruptures. (Tr. 189.)

In April 2003, plaintiff underwent a motility study of her esophagus, which results were normal. (Tr. 199.) In May 2003, she underwent an esophogeal study which revealed GERD. (Tr. 194.)

On June 3, 2003 she was evaluated by Mark Weinfeld, M.D., a cardiologist at Barnes-Jewish Hospital. (Tr. 191.) At that time plaintiff complained of continued chest pains which she described as feeling like she had a brick on her chest with symptoms lasting all day and worsening with movement. (Tr. 191.) Dr. Weinfeld's notes indicate plaintiff was a former pack-a-day smoker for fifteen years, but quit smoking in 2002. Dr. Weinfeld's impression was that her chest discomfort had a musculoskelatal component, as well as a GI component due to her marked reflux disease. He also believed there was likely a psychiatric component, at the very least exacerbating these other causes. Given plaintiff's concern about a heart attack, Dr. Weinfeld ordered a treadmill echocardiogram stress test and recommended she follow up with her gastroenterologist and her psychiatrist.

---

[5]Outside of the capsule of a joint. Stedman's at 686.

In July 2003, plaintiff sought treatment at the Mayo Clinic for chest pain, fatigue, and diffuse body aches. An examination revealed regular heart rate and rhythm, clear lungs, and normal pulmonary function tests. (Tr. 212.) Plaintiff had no neck, jaw, temple, back, or heel pain. (Tr. 213-14.) Plaintiff had significant tenderness over her costochondral (rib) joints, but had no muscle tenderness and a "completely normal" musculoskeletal examination. (Tr. 212, 215.) She had a full range of motion of her spine. (Tr. 215.) She tested positive for 6 of 18 fibromyalgia trigger points. (Tr. 215.) Her esophagus and stomach were "totally normal." (Tr. 211.) There was "no evidence whatsoever" of GERD, esophageal spasm, or any other well-defined GI disorder. (Tr. 216.) Plaintiff underwent tests which included a cardiac echogram, blood laboratory work, whole body bone scan, and an upper GI, all of which were normal. (Tr. 218-222.)

Plaintiff's symptoms were consistent with functional chest pain, for which the most effective therapy recommended was a low-dose antidepressant. (Tr. 216.) Final diagnoses were chest pain and fatigue. (Tr. 210.) Pending the results of laboratory tests for possible connective tissue disease, she was instructed to see a rheumatologist in St. Louis. (Tr. 215.) She was referred to the Mayo pain clinic. (Tr. 211.)

In September and October 2003, plaintiff saw Liwa Younis, M.D., and Nizar Assi, M.D., for evaluation of chest pain and shortness of breath on exertion. (Tr. 228.) An exercise stress test was normal. (Tr. 228.) She also underwent a bilateral carotid (artery) sonogram, which was normal. (Tr. 227.) Drs. Younis and Assi indicated that plaintiff's chest pain was atypical and unlikely to be of cardiac origin. (Tr. 229, 231.) Dr. Assi believed her chest pain could be secondary to GERD or anxiety. (Tr. 229.)

In December 2004, plaintiff was seen at Bi-State Medical Consultants by Dr. Zamir Eidelman, M.D. (Tr. 233-34). Tests revealed a positive rheumatoid factor, indicating she had rheumatoid arthritis. (Tr. 233.)

In August 2006, plaintiff underwent a consultative exam with Dr. Yusuf M. Chaudhry. Plaintiff's examination was generally normal, but she had trigger points, or hyper-irritable spots, over the upper back and

-4-

chest area, as well as localized tenderness over the lower sternum. (Tr. 237.) Dr. Chaudhry noted that plaintiff had no difficulty buttoning, unbuttoning, or using small parts or tools, did not require an assistive device to walk, and had no muscle spasm or muscle atrophy. (Tr. 237.) She also had no motor or sensory deficits, could squat and walk on her toes and heels, and had a normal gait. (Tr. 237.) Plaintiff had normal strength in her grip and all extremities. (Tr. 241-42.) Dr. Chaudhry diagnosed plaintiff with fibromyalgia, costochondritis, and chronic fatigue syndrome, and opined that her ability to perform work-related functions such as walking and lifting was moderately impaired. (Tr. 237.)

In May 2007, plaintiff underwent a consultative exam by Dr. Brenda Buckley. (Tr. 245.) Dr. Buckley noted that plaintiff had been complaining of problems for five years; that most of her test results were negative; and that she had been diagnosed with several impairments, but with no conclusive diagnosis. (Tr. 245.) On examination, plaintiff appeared in no acute distress, walked normally, and was able to climb on and off the examination table without difficulty. (Tr. 247.) She had a normal gait and good grip strength. (Tr. 247.) Her upper and lower extremity strength was generally good, and she was able to walk on her toes and heels. (Tr. 248-50.) She had no muscle tenderness or atrophy, and her range of motion was normal. (Tr. 248-49.) Dr. Buckley diagnosed plaintiff with rheumatoid arthritis and chronic fatigue syndrome. (Tr. 248.) She opined that plaintiff could stand and sit for two hours each in an eight-hour workday, walk one quarter of a mile at a time, and lift and carry ten to twenty pounds at a time. (Tr. 248.)

On June 11, 2007, plaintiff was seen by Andrew Baldassare, M.D., an arthritis consultant, for morning stiffness. Plaintiff described her chest pain as being her most severe pain. (Tr. 264.) Her rheumatoid factor on this date was negative. (Tr. 268.) Dr. Baldassare ordered a whole body bone scan, which was normal. (Tr. 273.)

In January 2008 correspondence, Dr. Baldassare stated that plaintiff had significant chest wall tenderness and had 18 out of 18 fibromyalgia trigger points. A rheumatoid factor test was negative. (Tr. 301.) The results of a muscle enzyme test and whole body bone scan were normal (Tr.

301). Dr. Baldassare assessed fibromyalgia. He stated that, because he had seen plaintiff only once during the previous six months, it was difficult for him to evaluate her functional limitations. (Tr. 301.) He opined that she would not be able to do any repetitive lifting, stand or walk more than one hour at one time, and sit more than two hours at one time. (Tr. 301.) He opined that she would have difficulty with pushing, pulling, bending, stooping, lifting, or carrying. (Tr. 301.)

In April 2008, Dr. Baldassare recommended plaintiff seek pain management treatment. (Tr. 275.) He wrote on a prescription pad "To whom it may concern: Lisa Copeland/Shaffer is incapable of gainful employment." (Tr. 274.) In May 7, 2008 correspondence, he restated his opinion that plaintiff could not work due to her rheumatological condition. (Tr. 278.)

Two months later, Caroline Chang, a physician's assistant, noted that plaintiff had undergone extensive cardiac, gastrointestinal, and rheumatological tests, all of which were essentially unrevealing. (Tr. 289.) Plaintiff was tender to palpation over her midsternal region. (Tr. 289.) Ms. Chang diagnosed ongoing chest discomfort and bloating and loose stools. (Tr. 289.)

Approximately one week later, in June 2008, plaintiff sought treatment in the emergency room of Missouri Baptist Medical Center for abdominal pain. (Tr. 304, 306.) She stated that she had awoken that morning with severe abdominal pain that she rated as an eight out of ten. (Tr. 308.) She underwent blood laboratory testing, an abdominal ultrasound, and was given medications for her symptoms. (Tr. 309-312.) The ultrasound revealed normal kidneys, liver, and pancreas. (Tr. 313.) She was diagnosed with Irritable Bowel Syndrome (IBS) and discharged. (Tr. 314, 320.)

Plaintiff saw Leonard Weinstock, M.D., a gastroenterologist, on June 17, 2008 for continued chest pain and acid regurgitation. (Tr. 283-99, 286.) Her midchest discomfort was worse after large meals and cold beverages. (Tr. 289.) She also complained of bloating and loose stools. (Tr. 289.) Possible diagnoses were esophagitis (inflammation of the esophagus), esophageal spasms, and GERD. (Tr. 289.) However, a GI source of discomfort would not explain the chest wall tenderness. (Tr.

289.) Plaintiff saw Dr. Weinstock again on June 26, 2008 and she reported her chest pain at a level six out of ten. (Tr. 283.) Dr. Weinstock noted her IBS diagnosis and associated symptoms. (Tr. 283.) He found no unusual anxiety or evidence of depression and assessed chest pain and blind loop syndrome.[6] (Tr. 285.)

On June 26, 2008, plaintiff underwent a lactulose breath test to detect intolerance to lactose and overgrowth of bacteria in the small intestine. She was found to have an abnormal hydrogen response and atypical pattern. Xifaxin, an antibiotic, was prescribed. (Tr. 295.) She underwent an upper endoscopy on June 30, 2008, showing her esophagus was normal. (Tr. 292.) Tissue biopsies were normal. (Tr. 293-94.)

Dr. Baldassare saw plaintiff in December 2008. (Tr. 324-30.) Blood work from December 3, 2008 was interpreted as suggestive of a past Epstein Barr virus infection. (Tr. 326.) Dr. Baldassare completed a Physician Statement, opining that plaintiff should engage in no repetitive lifting; could stand and/or walk less than two hours in an eight hour work day; and could sit less than six hours in an eight hour work day. (Tr. 323.) He opined plaintiff was limited in the ability to push and pull with both the upper and lower extremities. (Tr. 323.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on December 23, 2008. (Tr. 16-40.) Plaintiff, who was 43 years old at the time, testified that she had an associate's degree and was a registered nurse with prior work as a floor nurse and as a director of nursing. (Tr. 21, 24-25.) She testified she last worked for a period of approximately one and a half months in 2003, after not being able to work for several months. (Tr. 22.)

Plaintiff testified that she had undergone bilateral breast implants, and began experiencing chest pain in 2002. (Tr. 27.) She testified that in 2003 she had the implants removed, and had attempted

---

[6]Blind loop syndrome is the stagnation of intestinal contents with bacterial overgrowth. Stedman's at 1891.

-7-

to return to work after the surgery, but was unable to due so because of pain. (Tr. 23.) Although she had the implants removed in 2003, her pain did not improve. (Tr. 27.) Plaintiff testified she was never entirely pain free, and the pain ranged from an eight to ten on a ten-point scale. (Tr. 28.) Plaintiff testified she took Tylenol, Cymbalta, and used ice packs for her pain, without success. (Tr. 28.) She testified other doctors had attempted to prescribe narcotic pain relievers, but she did not take them because she did not want to take narcotics or deal with unwanted side effects. (Tr. 29.)

Plaintiff testified that she had worked in nursing for fifteen years. She testified that while working as a director of nursing, she spent most of her time observing and helping staff, requiring her to physically work with patients with little time in an office. (Tr. 26.)

Plaintiff testified she had pain and stiffness in her hands, knees, feet, and ankles. (Tr. 29.) She testified she was having trouble completing many household chores despite attempts to do so. (Tr. 31.) She testified she needed assistance when doing heavy grocery shopping, and was unable to do any yard work. (Tr. 29-34.) Plaintiff estimated she could stand for thirty minutes at one time; sit for thirty minutes at one time before needing to change position; and walk for one hour before feeling pain and fatigue. (Tr. 34-35). She was able to lift ten pounds. (Tr. 35.)

Plaintiff had a driver's license and was able to drive. (Tr. 21-22.) She testified she did not vacuum or mop, but was able to sweep the floor twice a week. (Tr. 30-31.) She did light chores, such as washing dishes, wiping counters or spills, and picking up newspapers or laundry, and needed to rest after doing chores. (Tr. 32-33.) She was able to cook simple meals. (Tr. 33.)

Vocational expert (VE) Brenda Young also testified at the hearing. (Tr. 35.) The VE classified plaintiff's past work as an RN and director of nursing as skilled heavy work as performed by plaintiff. (Tr. 36.) The ALJ then posed a hypothetical of a person able to lift and carry ten pounds occasionally; stand and/or walk for a total of two hours in an eight-hour work day with the normal breaks; sit for a total of up to two hours in an eight-hour work day; who should not engage in climbing items

such as ladders or scaffolds, but could occasionally maneuver ramps, stairs and stoop, kneel or crouch, but not crawl. (Tr. 36-37.) The VE testified that a hypothetical person with such limitations would not be able to perform any of plaintiff's past work. (Tr. 37.) She testified that a person with the residual functional capacity (RFC) and the same vocational capabilities as plaintiff would have the ability to adjust to and perform other work, but it would not be at the skilled level. (Tr. 37.)

The ALJ posed a second hypothetical in which the same worker would be limited to jobs involving understanding, remembering, and following simple instructions and directions in a routine work setting. (Tr. 38.) The VE testified that such a person would be limited to assembly types of work. (Tr. 38.) The ALJ then posed a third hypothetical of the same person working as in the second hypothetical with additional factors of sitting, standing and walking for no longer than one hour at a time without a break. (Tr. 38.) The VE testified that work for this individual would be eliminated. (Tr. 38.)

Plaintiff's counsel posed a hypothetical based on Dr. Buckley's report. (Tr. 39.) The hypothetical assumed a person of the same age, education and prior work history as plaintiff, with work limited to carrying and lifting no more than ten to twenty pounds occasionally. The hypothetical limited work to sitting two hours in an eight-hour work day; standing two hours in an eight-hour day; and walking a quarter of a mile at one time. (Tr. 39.) The VE testified such a person would not be able to do plaintiff's past relevant work. (Tr. 39.) The VE did not answer if there was other work the hypothetical claimant could perform with these restrictions. (Tr. 39.)

### III. DECISION OF THE ALJ

On February 27, 2009, the ALJ issued an unfavorable decision. The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2008. The ALJ found that plaintiff had not engaged in substantial gainful activity since May 1, 2003, her alleged onset date. At Step Two, the ALJ found there were no medical signs or laboratory findings to substantiate the existence of a

-9-

severe medically determinable impairment. (Tr. 10.) Consequently, the ALJ found plaintiff was not disabled under the Act, ending his analysis at Step Two. (Tr. 14.)

The ALJ found that the main problems that kept plaintiff from working were chest pain, and arthritis that caused fatigue. (Tr. 11.) The ALJ found plaintiff had not been treated for depression and cited records from Dr. Weinstock from June 2003 which characterized plaintiff's various tests as "essentially negative." (Tr. 11.) The ALJ noted that during a consultative exam, the examining physician found plaintiff's walking and lifting were moderately impaired, but noted no real deficits other than localized tenderness. (Tr. 11.)

The ALJ discounted the medical source statements of Dr. Baldassare because they had no objective evidence to support them. (Tr. 11-12.) The ALJ found no objective evidence to support plaintiff's diagnosis of fibromyalgia. (Tr. 12.) The ALJ discussed the findings of the consultative examiner Dr. Buckley, concluding that little weight was to be given to the limit of two hours sitting, characterizing it as contrary to other findings. (Tr. 12.) The ALJ also noted many of plaintiff's tests results were normal. (Tr. 13.) The ALJ discussed plaintiff's positive Epstein-Barr virus tests, but found this was not persuasive because the test merely indicated the presence of the antibody, not an active infection. (Tr. 13.)

The ALJ found the medical record evidence did not support a finding that plaintiff had sought consistent treatment or that her other allegations and symptoms have restricted her. (Tr. 13-14.) The ALJ determined there was no severe medically determinable impairments, stating there were no medical signs or laboratory findings to substantiate their existence. (Tr. 10, 13, 14.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough

that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

**V. DISCUSSION**

Plaintiff argues the ALJ erred in (1) determining that there was no severe medically determinable impairment at Step Two; and (2) according inadequate weight to the opinions of her treating and consultative examining physicians.

**A.  Step Two of the Sequential Analysis**

The ALJ determined that plaintiff did not suffer from any severe impairments or combination of impairments that were of such severity as to limit her ability to perform basic work activities. Specifically, he stated there were no medical signs or laboratory findings to substantiate the existence of a severe medically determinable impairment, thus ending the inquiry at Step Two of the five-step evaluation process. (Tr. 10.) Plaintiff argues that because she was diagnosed with fibromyalgia, costochondritis, and chronic fatigue syndrome, the ALJ should have found these impairments severe. The undersigned disagrees.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). The claimant bears the burden of proving her impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant. Id.; Dewald v. Astrue, 590 F. Supp.2d 1184, 1200 (D.S.D. 2008). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ." Kirby, 500 F.3d at 707; see also Germany-Johnson v. Comm'r of Soc. Sec., 313 F. App'x 771, 774 (6th Cir. 2008) (per curiam) (Step-Two severity review is used primarily to screen out totally groundless claims). Social Security Ruling 85-28 states:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued.... [S]equential evaluation requires that the adjudicator evaluate the individual's ability to do past work,

-12-

or to do other work based on the consideration of age, education, and prior work experience.

Social Security Ruling 85-28, quoted in Bowen v. Yuckert, 482 U.S. 137, 158, (O'Connor, J., concurring); see also Gilbert v. Apfel, 175 F.3d 602, 604-05 (8th Cir. 1999)(same).

In applying the second step of the sequential evaluation process, "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the evaluation process. Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987) (quoting Bowen v. Yuckert, 482 U.S. 137, 158, (1987) (O'Connor, J., concurring)); see also Kirby, 500 F.3d at 707 (an impairment is not severe if it amounts to only a "slight abnormality" and does not significantly limit the claimant's physical or mental ability to do basic work activities); 20 C.F.R. § 404.1521(a) (same).

Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id. The sequential evaluation process terminates at Step Two if the impairment has no more than a minimal effect on the claimant's ability to work. Kirby, 500 F.3d at 707.

Applying this standard here, the record evidence indicates plaintiff's impairments did not amount to more than a minimal limitation on her ability to perform basic work activities. The evidence shows that over the course of her treatment, plaintiff generally had normal muscle and grip strength, a full range of motion, and a normal gait. (Tr. 179-80, 212-15, 237, 241-42, 247, 248-50.) Dr. Hoffman noted that plaintiff's hands, wrists, elbows, and shoulders were relatively unremarkable, and she had a good range of motion of both knees and hips. (Tr. 179.) Mayo Clinic records show that plaintiff had no neck, jaw, temple, back, or heel

pain, no muscle tenderness, and a "completely normal" musculoskeletal examination with a full range of motion of the spine. (Tr. 212, 215.) Consultative examiner Dr. Chaudhry noted that plaintiff had no difficulty buttoning, unbuttoning, or using small parts or tools and did not require an assistive device to walk. (Tr. 11, 237.) Although plaintiff testified that she spent most of her time lying down, her examination revealed no muscle spasm or muscle atrophy, and she had normal strength in her grip and all extremities. (Tr. 11, 237, 247-50.) Another consultative examiner, Dr. Buckley, noted that plaintiff appeared in no acute distress, walked normally, was able to get on and off the examination table without difficulty, and had good grip strength and nearly normal strength in all extremities. (Tr. 247-50.)

The medical records show that plaintiff's chest pain was atypical, and the results of her extensive medical tests were generally normal. Specifically, Dr. Assi noted that plaintiff's chest pain was inconsistent and "not usually very limiting functionally." (Tr. 229.) Dr. Weinstock indicated that the results of plaintiff's tests for chest pain were all essentially negative, and that her chest pain was actually "throat tightness." (Tr. 11, 290.) Dr. Buckley noted that the majority of plaintiff's medical tests were negative. (Tr. 245.) Plaintiff reported to Dr. Chaudhry that she had had "all kinds of tests, which have been negative," except for a positive rheumatoid factor test. (Tr. 11, 235.) However, Dr. Baldassare also reported that plaintiff's most recent rheumatoid factor test in June 2007 was negative. (Tr. 12, 268.) Ms. Chang noted that plaintiff had undergone extensive cardiac, gastrointestinal, and rheumatologic tests, all of which were essentially unrevealing. (Tr. 289.) The results of a whole body bone scan were also normal. (Tr. 12, 273.)

The undersigned concludes that the medical evidence simply did not support plaintiff's allegations that her impairments were severe. There was no medical evidence indicating that plaintiff's impairments would have more than a minimal impact on her ability to perform basic work activities. See 20 C.F.R. §§ 404.1521(a), 416.921(a). Thus, the undersigned concludes the ALJ properly found plaintiff had no severe impairment.

**B.   Opinions of Treating and Consultative Physicians**

Plaintiff next argues the ALJ erred in giving inadequate weight to the opinions of her treating physicians and consulting examiners. The Commissioner argues the ALJ properly considered these opinions, along with the medical evidence of record, and found plaintiff had not proven her impairments were severe.

The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). See 20 C.F.R. § 404.1527(d)(2). An ALJ may elect under certain circumstances not to give controlling weight to treating doctors' opinions. A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Id.; see also Hacker, 459 F.3d at 937; 20 C.F.R. § 404.1527(d)(2). It is the ALJ's duty to resolve conflicts in the evidence. See Hacker, 459 F.3d at 936.

In this case, the ALJ considered Dr. Baldassare's opinions that plaintiff was incapable of gainful employment. (Tr. 11-12, 278.) However, Dr. Baldassare's opinion regarding plaintiff's ability to be gainfully employed is not a medical opinion. See Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991) (treating physician's opinion that a claimant is disabled is not a medical opinion; treating physician's statement as to ultimate issue of disability is not controlling, but is solely the responsibility of the ALJ).

With respect to Dr. Baldassare's opinions on plaintiff's functional restrictions (Tr. 301), the ALJ properly found they were inconsistent with other record evidence and accorded them little weight. (Tr. 11-12, 14.) Specifically, the ALJ noted there was essentially no objective evidence to support the limitations set forth by Dr. Baldassare. (Tr. 14.) Dr. Baldassare stated that plaintiff had eighteen out of eighteen fibromyalgia trigger points. However, his treatment notes do not indicate he had

performed a trigger point examination. (Tr. 12, 301.)  Dr. Baldassare also acknowledged that all of plaintiff's test results were normal. (Tr. 12, 301.)  Dr. Baldassare noted he had seen plaintiff only twice, including only once during the previous six months, and therefore "it [was] difficult for him to evaluate her functional limitations." (Tr. 12, 301.)  Nevertheless, he opined that plaintiff was severely limited in the ability to perform all basic work activities. (Tr. 274, 301.)  This record limits the reliability of Dr. Baldassare's opinions and findings.

Plaintiff also argues that Dr. Baldassare's opinions are consistent with those of her consultative examiners, and therefore should be assigned substantial weight.  The undersigned notes that while three physicians, Drs. Baldessare, Chaudhry, and Buckley, made diagnoses of fibromyalgia, costochondritis, or chronic fatigue syndrome, these diagnoses alone do not demonstrate the existence of severe impairments.  See Dean v. Astrue, 2009 WL 1765196, at *5 (W.D. Mo. June 22, 2009) (medical opinions do not make substantial evidence; ALJ found that some medical opinions amounted to legal conclusions as to whether claimant was "disabled" or "unable to work," determinations assigned solely to the discretion of the Commissioner; such statements simply "are not conclusive as to the ultimate question" of disability); Cf. Perez v. Barnhart, 415 F.3d 457, 462 (5th Cir. 2005)(in determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history).  In this case, these physicians also opined that plaintiff had moderate to severe limitations in her ability to perform basic work functions.  While there is some consistency amongst these opinions, the ALJ was correct in discrediting them based on the aforementioned discussion that they were unsupported by the objective medical evidence.

Moreover, these physicians' opinions were inconsistent with their own treatment and examination records.  Dr. Chaudhry found plaintiff had some trigger points over the upper back and chest and localized tenderness over the lower sternum, although her examination was otherwise normal. (Tr. 237.)  Plaintiff had no difficulty with fine motor movement, walking,

or squatting. (Tr. 237.) She had normal strength, no muscle spasm, and no muscle atrophy. (Tr. 237.) Dr. Buckley found plaintiff could walk normally, climb on and off the examination table without difficulty, and walk on her toes and heels. (Tr. 247-50.) She had generally good strength and range of motion, with no muscle tenderness or atrophy. (Tr. 12, 247-50.) Dr. Baldassare noted plaintiff's test results were normal. (Tr. 268, 273, 301.) Although he diagnosed plaintiff with fibromyalgia, he did not indicate he ever performed a trigger point examination. (Tr. 12, 301.) The opinions of the treating physicians and consultative examiners were inconsistent with their own records and with other substantial record evidence. Accordingly, the ALJ correctly assigned them little weight.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 3, 2011.